**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                              :
LORI RUSSO,                   :    CIVIL ACTION NO. 10-1624 (MLC)
                              :
     Plaintiff,               :    MEMORANDUM OPINION
                              :
     v.                       :
                              :
CHICO'S FAS, INC., d/b/a      :
CHICO'S WHITEHOUSE/           :
BLACK MARKET, et al.,         :
                              :
     Defendants.              :
_____:
```

**COOPER, District Judge**

Plaintiff, Lori Russo, brought this action against defendants, Chico's FAS, Inc., d/b/a Chico's WhiteHouse/Black Market ("Chico's") and Elizabeth Medeiros ("Medeiros") (collectively, "Defendants"), in New Jersey state court alleging violations of the Conscientious Employee Protection Act ("CEPA"), N.J.S.A. § 34:19-1 et seq., and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1 et seq. (Dkt. entry no. 1, Rmv. Not., Ex. A, Compl.) Defendants removed the action to this Court, alleging jurisdiction pursuant to 28 U.S.C. § 1332(a). (Rmv. Not. at 1-2.)

Defendants move for summary judgment in their favor pursuant to Federal Rule of Civil Procedure ("Rule") 56. (Dkt. entry no. 19.) Plaintiff opposes the motion insofar as Defendants seek judgment in their favor on her NJLAD claim, but has agreed to

voluntarily dismiss her CEPA claim.  (Dkt. entry no. 31, Pl. Br. at 17.)

The Court held a telephonic status conference on June 6, 2011, at which time oral argument on the motion was scheduled for July 5, 2011.  (Dkt. entry no. 42.)  Plaintiff's counsel passed away unexpectedly on June 13, 2011.  (Dkt. entry no. 44, 6-30-11 Letter Order (requesting a status update from Plaintiff regarding possibility of retaining new counsel).)  On September 1, 2011, the Magistrate Judge granted Plaintiff an extension of time in which to retain new counsel, and ordered that any new counsel must enter an appearance no later than October 7, 2011.  (Dkt. entry no. 47, 9-1-11 Letter Order.)  The Magistrate Judge further ordered that if new counsel did not enter an appearance by October 7, 2011, Plaintiff would be deemed to be proceeding with prosecution of the matter pro se, and the Court would consider the motion on the papers, pursuant to Rule 78(b).  (Id.)

The time for Plaintiff to retain new counsel has passed, and Plaintiff orally advised the Chambers of the Magistrate Judge on October 12, 2011, that she would proceed pro se.  The Court now considers the fully-briefed motion without oral argument, pursuant to Rule 78(b) and Local Civil Rule 78.1(b).  The Court, for the reasons stated herein, will grant the motion.

**BACKGROUND**

## I.    Plaintiff's Employment at Chico's

Plaintiff was hired as a Store Manager at Chico's WhiteHouse/Black Market store in North Brunswick, New Jersey, in March 2008.  (Dkt. entry no. 21, Defs. Stmt. Facts at ¶ 1; dkt. entry no. 33, Pl. Resp. Stmt. Facts at ¶ 1.)  Plaintiff's duties as Store Manager included, <u>inter alia</u>, (1) sales and customer satisfaction; (2) store operations; (3) human resources management, such as (a) preparing weekly schedules and monitoring payroll, (b) reviewing time sheets and payroll to verify the accuracy of hours worked, and (c) ensuring compliance with Chico's Employee Handbook guidelines, policies, and procedures; and (4) taking necessary action to comply with Chico's "Guiding Principles for Stores" manual.  (Defs. Stmt. Facts at ¶ 5; Pl. Resp. Stmt. Facts at ¶ 5.)

Medeiros became Plaintiff's District Manager in December 2008.  (Defs. Stmt. Facts at ¶ 11; Pl. Resp. Stmt. Facts at ¶ 11.)  Their first in-person encounter occurred at Plaintiff's store in January 2009, during which Medeiros immediately confronted Plaintiff for violating various store policies, motivating Plaintiff to request a transfer out of Medeiros's district.  (Defs. Stmt. Facts at ¶ 12; Pl. Resp. Stmt. Facts at ¶ 12; Pl. Dep. at 48:1-49:20; dkt. entry no. 23, Medeiros Decl. at ¶ 5.)  Plaintiff's request for a transfer was denied.  (Defs.

3

Stmt. Facts at ¶ 15; Pl. Resp. Stmt. Facts at ¶ 15.)  Medeiros
issued Plaintiff a Record of Associate Contact ("ROAC"), dated
January 20, 2009, listing various performance issues to be
addressed by Plaintiff.  (Defs. Stmt. Facts at ¶ 13; Pl. Resp.
Stmt. Facts at ¶ 13; Medeiros Decl., Ex. A, 1-20-09 ROAC.)[1]

Medeiros issued Plaintiff another ROAC on March 11, 2009,
for "failure to meet the job responsibilities of a Store Manager"
since February 21, 2009, including not reaching the store's sales
goals for February, missing a meeting, and failing to ensure that
sales associates took required meal breaks.  (Defs. Stmt. Facts
at ¶ 35; Pl. Resp. Stmt. Facts at ¶ 35; Medeiros Decl., Ex. B, 3-
11-09 ROAC.)  On April 15, 2009, Plaintiff received an overall
rating of "requires improvement" on a performance evaluation for
the period spanning her hire date through January 31, 2009.
(Defs. Stmt. Facts at ¶ 40; Pl. Resp. Stmt. Facts at ¶ 40;
Medeiros Decl., Exs. C & D, Performance Appraisal Form and 4-14-
09 ROAC.)

Plaintiff's employment was terminated on July 24, 2009.
(Defs. Stmt. Facts at ¶ 52.)  The reason for Plaintiff's
termination was "violating company policies," specifically,
changing the information on the time records of sales associates.
(Pl. Resp. Stmt. Facts at ¶ 52.)  Laura Coletti ("Coletti"), a

---

[1] Plaintiff describes a "ROAC" as "a written document that a
conversation with an associate occurred regarding a performance
related issue."  (Dkt. entry no. 30, Pl. Supp'l Stmt. Facts at ¶
12.)

4

Regional Sales Manager for Chico's, "approved the termination of Plaintiff's employment in July 2009 based upon her history of Records of Associate Contact, performance issues, failure to improve after coaching sessions, and timecard changes to reflect that meal periods had been taken by associates."  (Dkt. entry no. 25, Coletti Decl. at ¶ 4.)

Plaintiff asserts that, as Store Manager, she had authority to adjust sales associates' time records in the event of some type of error or omission with regard to the sales associates' clocking in or out.  (Dkt. entry no. 30, Pl. Supp'l Stmt. Facts at ¶ 7.)  She further contends that such adjustments were required "on a daily basis" to correct sales associates' failure to record their time accurately.  (Id. at ¶¶ 8-9.)  Medeiros, while concurring that "management is authorized to make certain daily adjustments to time clock entries to correct errors or clocking omissions," asserts that Plaintiff was nevertheless terminated because of the manner in which she changed sales associates' time records.  (Medeiros Decl. at ¶ 11; dkt. entry no. 32, Fusco Cert., Medeiros Dep. 42:15-20.)

Medeiros states, and Plaintiff does not dispute, that Medeiros spoke to Plaintiff on July 3, 2009, to direct Plaintiff to ensure compliance with Chico's meal breaks policy.  (Medeiros Decl. at ¶ 9; Defs. Stmt. Facts at ¶ 44; Pl. Resp. Stmt. Facts at ¶ 44; Pl. Dep. at 141: 14-18.)  During her review of Plaintiff's

5

store's time records on July 7 or 10, 2009, Medeiros discovered
that "multiple edits" had been made to these records between 5:30
p.m. and 6:30 p.m. on July 3, 2009, "after [Medeiros] spoke with
Plaintiff about the meal periods issue," adding a half-hour meal
period for each associate and adjusting each associate's time
clocked in or out by a half-hour so that the time worked each day
remained the same.  (Medeiros Decl. at ¶ 10; Defs. Stmt. Facts at
¶¶ 44.)  Medeiros states that she is "not aware of any other
Store Manager in [her] district who changed an entire week of
time records by systematically changing associates' clock
in/clock out times by a half-hour and adding in a half-hour meal
period after the fact."  (Medeiros Decl. at ¶ 11.)  Plaintiff,
however, contends that the records of other Store Managers' time
adjustments for July 3, 2009, show that "there were more
adjustments made on other store's [sic] time cards than those
made on plaintiff's store time cards."  (Pl. Supp'l Stmt. Facts
at ¶ 34; Fusco Cert., Ex. F.)

## II.  Plaintiff's Disability

Plaintiff has alleged that she has a disability, namely,
Attention Deficit Hyperactivity Disorder ("ADHD"), a subset of
Attention Deficit Disorder ("ADD").  (Compl. at ¶ 15; Pl. Resp.
Stmt. Facts at ¶ 17.)[2]  Medeiros was unaware of Plaintiff's ADD

---

[2] Plaintiff "is not certain if she has hyperactivity," so we
refer herein to Plaintiff's "ADD" with the understanding that it
may encompass ADHD as well.  (Pl. Resp. Stmt. Facts at ¶ 17.)

until March 2009, when Plaintiff, Medeiros, and two co-workers were at a café and Plaintiff, in response to a "rude comment about Attention Deficit Disorder" made by one of the co-workers, stated that she "happen[ed] to be one of those people that have Attention Deficit Disorder" and was "really offended."  (Dkt. entry no. 22, Tiliakos Decl., Ex. B, Pl. Dep. at 151:11-152:24.) Medeiros and the other co-worker "did not say one word" during or after this exchange about ADD.  (Pl. Dep. at 153:9-11.)

Plaintiff testified that she never provided Chico's with any documentation that she had ADD, never sought any accommodation for her disability, never asked for any leave for her ADD symptoms, and "wasn't trying to come on as a disabled person." (Pl. Dep. at 157:4-20; Medeiros Decl. at ¶ 13.)  Coletti had no knowledge of Plaintiff's alleged disability when Coletti recommended Plaintiff's termination.  (Coletti Decl. at ¶ 5.) Likewise, Michelle Esposito, an Assistant Store Manager who worked with Plaintiff, "ha[d] no idea if [Plaintiff] has any type of disability."  (Tiliakos Decl., Ex. C, Esposito Dep. at 29:6-15.)

Plaintiff believes that Medeiros discriminated against her for her ADD, on the basis that Medeiros said things to her such as:  "What's wrong with your brain?", "Does your brain even work?", and "Can you even read?".  (Pl. Dep. at 116:12-14, 172:1-4.)  It is Plaintiff's "perception" that after Medeiros

discovered that Plaintiff has ADD, Medeiros "made the decision
. . . that [Plaintiff] could not do her job."  (Pl. Dep. at
173:14-20.)

### III. Complaints About Medeiros's Management Style

Plaintiff called Chico's "Open Door Line" on March 27, 2009,
to report that Medeiros spoke to her in a "demeaning, . . .
abusive and harassing" manner.  (Defs. Stmt. Facts at ¶ 36; Pl.
Dep. at 88:1-6.)[3]  After making this call, Plaintiff spoke to
Cindy Pape, a Chico's human resources manager, to complain that
Medeiros refused to permit Plaintiff to "borrow" sales associates
from other stores to allow Plaintiff to take a block of time off
from work for personal reasons.  (Pl. Resp. Stmt. Facts at ¶ 37.)

Following Plaintiff's termination on July 24, 2009,
Plaintiff again called the Open Door Line on July 27, 2009, to
recount the details of what this Court can only characterize as
her antagonistic work relationship with Medeiros.  The summary of
that call states that Plaintiff reported that:

> Medeiros would . . . make very rude and demeaning
> comments to Russo on a regular basis, dates unknown. .
> . . She also asked her frequently "Lori, what is wrong
> with your brain".  Furthermore, she laughed at Russo
> when Russo mentioned to her that she suffered from ADD.

---

[3] The "Open Door Line" is a toll-free number for Chico's
employees to call "to ask questions, communicate ideas, and
resolve operational issues with [a] supervisor or any member of
management," as well as to express concerns relating to Chico's
Equal Opportunity Employment and Harassment Prevention policies.
(Tiliakos Decl., Ex. D, Chico's Stores Handbook at 15.)

. . .

[After Plaintiff called the Open Door Line in March
2009 and spoke with Cindy Pape, Plaintiff] agreed to
try to move forward from the issue.  The conditions did
not improve and Medeiros continued to harass her and
make her feel inferior. . . .

With the opening of the Hamilton store about a month
ago, . . . Medeiros was willing to send out additional
help to this store, [whereas she had been unwilling to
assign associates from different stores to assist at
the North Brunswick store in order to accommodate
Plaintiff's request for time off].  Russo stated that
this was a clear case of discrimination considering
Medeiros had stated that she did not want "keys flying
all over the district" when she (Russo) requested time
off to move months earlier.

(Dkt. entry no. 24, Pape Decl., Ex. C, Ethics and Compliance

Employee Hotline Summary dated 7-27-09 (spelling of Medeiros's

name corrected).)

Medeiros states that she terminated the employment of at

least five other individuals, all Store Managers or Assistant

Managers, none of whom had any known or perceived disability, for

various reasons including poor performance.  (Medeiros Decl. at ¶

14.)  Medeiros also states that "during [her] time as District

Sales Manager for New Jersey, at least eleven managers or

assistant managers in [her] district resigned either because they

were about to be terminated or for other reasons."  (Id.)  She

states that during her time as District Sales Manager for New

Jersey, she was aware of only one manager with a known

disability, who was not terminated.  (Id. at ¶ 15.)[4]

According to Plaintiff, none of the Store Managers or

Assistant Managers in Medeiros's district had anything nice to

say about Medeiros.  (Defs. Stmt. Facts at ¶ 60; Pl. Resp. Stmt.

Facts at ¶ 60.)  Plaintiff testified that Medeiros "was not very

nice and also condescending" to "everybody" in Plaintiff's store.

(Pl. Dep. at 131:3-15; Pl. Resp. Stmt. Facts at ¶¶ 61-62.)

## DISCUSSION

## I.   Summary Judgment Standard

The standard for a motion for summary judgment is well-

settled and will be briefly summarized here.  Rule 56 provides

that summary judgment is proper if there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a

matter of law.  Fed.R.Civ.P. 56(a).  In making this

determination, the Court must "view[] the record in the light

most favorable to the non-moving party and draw[] all inferences

in that party's favor."  United States ex rel. Josenske v.

Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) (citing

---

[4] While Plaintiff "objects to this portion of the Declaration of
Medeiros . . . [as] self-serving and inadmissible" because
"[t]his information was not provided in responses to
interrogatories or during her deposition," Plaintiff does not
indicate that Plaintiff actually sought such information from
Medeiros through interrogatories or at her deposition.  (Pl.
Resp. Stmt. Facts at ¶ 55.)

10

Abramson v. William Patterson Coll., 260 F.3d 265, 276 (3d Cir. 2001)).

## II.  New Jersey Law Against Discrimination

The NJLAD is remedial social legislation that is to be liberally construed.  Andersen v. Exxon Co., U.S.A., 446 A.2d 486, 492 (N.J. 1982).  It provides in relevant part:

> It shall be an unlawful employment practice . . . for an employer, because of the . . . disability . . . of any individual, . . . to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. . . .

N.J.S.A. § 10:5-12.  The law prohibits discrimination against a person who "is or has been any time disabled . . . unless the nature and extent of the disability reasonably precludes the performance of the particular employment."  N.J.S.A. § 10:5-4.1. The NJLAD defines "disability" to include "any mental, psychological or developmental disability . . . which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques."  N.J.S.A. § 10:5-5(q). "Thus, although it prohibits discriminatory employment practices, [NJLAD] acknowledges the right of employers to manage their businesses as they see fit."  Viscik v. Fowler Equip. Co., 800 A.2d 826, 833 (N.J. 2002).

11

The Complaint asserts that Defendants violated the NJLAD because "the termination of plaintiff's employment [was] due to her disability." (Compl. at ¶ 18.) We therefore consider her NJLAD claim one for discriminatory discharge, as opposed to, e.g., disparate treatment, retaliation, or failure to accommodate.

To establish a claim for discriminatory discharge under the NJLAD, a plaintiff must first show that (1) she was disabled within the meaning of the law, (2) she was meeting the employer's legitimate performance expectations, (3) she was terminated, and (4) the employer sought someone to perform the same work after she left. Jansen v. Food Circus Supermkts., Inc., 541 A.2d 682, 692 (N.J. 1988); Clowes v. Terminix Int'l, Inc., 538 A.2d 794, 805 (N.J. 1988); see also Armstrong v. Burdette Tomlin Mem. Hosp., 438 F.3d 240, 249 (3d Cir. 2006). Once the plaintiff makes this prima facie showing, a presumption of discrimination arises, and "the burden of going forward shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." Viscik, 800 A.2d at 833.

The burden of production then shifts back to the plaintiff to show that the employer's proffered reason was a mere pretext for discrimination. Id.; see generally McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). To defeat summary judgment in favor of the employer where the employer has come

12

forth with legitimate, non-discriminatory reasons for the employment action, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." LaResca v. Am. Tel. & Tel., 161 F.Supp.2d 323, 335-36 (D.N.J. 2001); cf. Viscik, 800 A.2d at 833 ("To prove pretext . . . a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent.")  In other words, an employee's firing may be unfair, but not illegal. Erickson v. Marsh & McLennan Co., Inc., 569 A.2d 793, 804 (N.J. 1990).  The burden of proving discrimination remains with the employee at all times. Zive v. Stanley Roberts, Inc., 867 A.2d 1133, 1140 (N.J. 2005).

**III. Analysis of Plaintiff's Claim**

**A.   Prima Facie Case of Disability Discrimination**

**1.   Plaintiff's Disability**

Defendants contend that Plaintiff has not established the first element of her prima facie case because she has demonstrated neither that she has a disability within the meaning of the NJLAD, nor that the defendant employer knew of the

13

disability.  (Dkt. entry no. 20, Defs. Br. at 15 (citing <u>Geraci</u> <u>v. Moody-Tottrup, Int'l</u>, 82 F.3d 578, 582 (3d Cir. 1996)).)

ADD and other psychiatric disorders can constitute a disability under the NJLAD.  <u>See</u> <u>Domurat v. Ciba Specialty Chems.</u> <u>Corp.</u>, 801 A.2d 423, 433 (N.J. App. Div. 2002).  However, Plaintiff's assertion that she has ADD does not end the inquiry; she must point to evidence corroborating this assertion, such that a factfinder could conclude that Plaintiff is "disabled" as that term is defined under the statute.  N.J.S.A. § 10:5-5(q) (defining "disability"); <u>see, e.g.</u>, <u>Clowes</u>, 538 A.2d at 807 (holding that alcoholism is a handicap within the NJLAD, but plaintiff had failed to prove his alcoholism); <u>Enriquez v. W.</u> <u>Jersey Health Sys.</u>, 777 A.2d 365, 376 (N.J. App. Div. 2001) ("While we have concluded that gender dysphoria can constitute a handicap, we have problems with the proofs submitted by plaintiff during the summary judgment proceedings.").[5]

Plaintiff has provided copies of her psychiatrist's records, which indicate that Plaintiff was treated for, <u>inter</u> <u>alia</u>, ADD. (Fusco Cert., Ex. A, Medical Records.)  She submits an excerpt

---

[5] A 2003 amendment to the NJLAD replaced statutory references to a "handicap" with the term "disability."  2003 N.J. Sess. Law Serv. Ch. 180 (Assembly 3774) (West).  <u>See generally</u> <u>Olson v.</u> <u>Gen. Elec. Astrospace</u>, 101 F.3d 947, 956-57 & n.6 (3d Cir. 1996) (discussing difference between "disabled" under the Americans with Disabilities Act and "handicap" under NJLAD); <u>State v.</u> <u>Dixon</u>, 933 A.2d 978, 984 (N.J. App. Div. 2007) (noting that while the NJLAD "was amended to delete the term 'handicap' and substitute 'disability'. . . . [t]he current definition of the term remains essentially the same").

from the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") detailing the diagnostic features and criteria of "Attention-Deficit/Hyperactivity Disorder."  (Fusco Cert., Ex. B, DSM-IV at 85-88, 92-93.)  Additionally, Plaintiff testified that she was diagnosed with ADD as a child.  (Pl. Dep. at 153:12-25.)

Plaintiff's psychiatrist's records consist of notes for five monthly appointments Plaintiff attended.  Only the most recent one, dated July 13, 2009, contains any reference to ADD. The remaining records, for visits occurring between February 2009 and June 2009, indicate that Plaintiff was being treated for generalized anxiety disorder and/or mood disorder.  The records are not authenticated by Plaintiff's treating psychiatrist, and are thus inadmissible.  See Fed.R.Civ.P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

Plaintiff's unauthenticated psychiatrist's records and own admission of having ADD will not carry her burden of demonstrating that she was disabled within the meaning of the

NJLAD at the time of her termination.  See Clowes, 538 A.2d at 805-07 (holding that hospital records containing alcoholism diagnosis were hearsay evidence and, in the absence of any other competent and legal evidence in the record to support such a diagnosis, including plaintiff's own testimony regarding his drinking habits, were not sufficient to sustain a finding that plaintiff was an alcoholic).  And Plaintiff's providing excerpts of the DSM-IV pertaining to ADD, without more, does nothing to prove either that she was diagnosed with ADD, or that her ADD was diagnosed by "'accepted clinical or laboratory diagnostic techniques.'"  Enriquez, 777 A.2d at 377 (quoting N.J.S.A. § 10:5-5(q)); see also id. at 375 (noting that listing of a mental disorder in DSM-IV "is not dispositive for classification as a disability under the LAD").  Under the NJLAD, "non-physical handicaps . . . require an ample amount of medical proof in order to be considered a disability."  Opacity v. Aramark Sports, LLC, No. 05-5328, 2008 WL 2783149, at *6 (D.N.J. June 16, 2008) (holding that plaintiff's own admission of her anxiety disorder was not sufficient to prove that she was disabled); see also Viscik, 800 A.2d at 835 ("Where the existence of a [disability] is not readily apparent, expert medical evidence is required.") (emphasis added).  The record here lacks competent evidence of Plaintiff's alleged disability.

16

Plaintiff has also not shown, as she must, that Defendants knew of her alleged disability.  See Geraci, 82 F.3d at 581 ("[D]isabilities are often unknown to the employer, and because of that, the plaintiff must demonstrate that the defendant employer knew of the disability to state a prima facie case of unlawful discharge."); Illingworth v. Nestle U.S.A., Inc., 926 F.Supp. 482, 488-90 (D.N.J. 1996).  It is clear from the record that Plaintiff's alleged ADD was "not readily apparent."  Viscik, 800 A.2d at 835.  Plaintiff testified that her ADD did not interfere with her work performance.  (Pl. Dep. at 171:11-18.) She further testified that she: (1) "didn't feel that [she] needed to provide Chico's with any documentation that [she] had attention deficit disorder.  That did not affect [her] job ability. . . ."; (2) "wasn't trying to come on as a disabled person"; (3) did not provide Chico's any documentation of having ADD or ask for any accommodation; and (4) never asked for any leave time due to her ADD.  (Pl. Dep. at 157:4-20.)  These admissions indicate that Defendants had no basis to perceive Plaintiff as being disabled, even accepting as true Plaintiff's assertion that Medeiros heard Plaintiff say in March 2009 that Plaintiff has ADD.  See Capilli v. Whitesell Constr. Co., No. 04-5777, 2006 WL 1722354, at *11 (D.N.J. June 21, 2006) (granting summary judgment in favor of employer where plaintiff produced no evidence that her supervisor perceived her as being disabled, and

it would have been "sheer speculation" that company president,
who terminated plaintiff, had knowledge of disability,
notwithstanding that plaintiff had told "a few co-workers that
she had trouble breathing and was sick").

We therefore find that Plaintiff has not met the first
element of her prima facie case for unlawful discharge under the
NJLAD.  We will briefly discuss the remaining elements.

### 2.   Plaintiff's Performance

To meet the second prong of a prima facie case for
discriminatory discharge, a plaintiff need only "produce evidence
showing that she was actually performing the job prior to the
termination."  Zive, 867 A.2d at 1143.  The question of whether a
plaintiff was meeting an employer's legitimate expectations "is
an objective and not a subjective standard," and courts are to
reserve the issue of the employer's subjective expectations for
the pretext inquiry.  Id.; see also El-Sioufi v. St. Peter's
Univ. Hosp., 887 A.2d 1170, 1183 (N.J. App. Div. 2005) ("Any
evidence relating to plaintiff's job performance, post-Zive,
becomes a part of the proofs to be considered in evaluating the
other parts of the traditional McDonnell Douglas test.").

There is no dispute that Plaintiff was "actually performing
her job" up until the date of her termination, July 24, 2009,
ROACs notwithstanding.  (Pl. Br. at 13; Defs. Stmt. Facts at ¶¶
1, 35-43, 52.)  This suffices to allow the Court to "move forward

18

past the prima facie case on this prong." Thomasian v. N.J. Inst. of Tech., No. 08-2218, 2010 WL 1032653, at *4 n.16 (D.N.J. Mar. 16, 2010) (finding that plaintiff challenging denial of tenure satisfied the second element of his prima facie case, that he "was sufficiently qualified to be among those persons for whom a selection for tenure would be made and yet was denied," where plaintiff "was arguably qualified for his position in that he was hired for it and had been performing in it for several years, albeit with significant performance problems").

### 3. Plaintiff's Termination

There is also no dispute that Plaintiff was terminated from her position on July 24, 2009. This constitutes an adverse employment action that satisfies the third prong of Plaintiff's prima facie case. See, e.g., Schwinge v. Deptford Twp. Bd. of Educ., No. 09-5964, 2011 WL 689615, at *4 (D.N.J. Feb. 17, 2011).

### 4. Employer Sought Another for Plaintiff's Position

Plaintiff testified at her deposition that on the day of her termination, within minutes of being escorted by Medeiros out of the store, she saw "Karen," the Store Manager at the Hamilton WhiteHouse/Black Market store, arrive at Plaintiff's store "to . . . take over and close" the store in her absence. (Pl. Dep. at 134:19-25; Pl. Supp'l Stmt. Facts at ¶ 31.) In her brief, Plaintiff characterizes this event, without citation to the record, thus: "Plaintiff was immediately replaced by Karen

19

Garcia, Store Manager of the Hamilton Store, upon her termination from Chicos." (Pl. Br. at 13.)

As Defendants point out, Plaintiff's testimony does not distinguish whether "Karen" was at the store to close it for the day, or to "take over [Plaintiff's] position." (Pl. Supp'l Stmt. Facts at ¶ 31; see dkt. entry no. 36, Defs. Resp. to Pl. Supp'l Stmt. Facts at 17.) However, in the absence of any indication by Defendants that Plaintiff's position went unfilled after her termination, we will construe Plaintiff's testimony in the light most favorable to her and presume that Plaintiff has established that Defendants sought another to perform the work of Store Manager.

**B.  Employer's Legitimate, Non-Discriminatory Reason for Plaintiff's Termination**

Assuming that Plaintiff had been able to demonstrate each element of her prima facie case, the burden of production would shift to Defendants to provide a legitimate, non-discriminatory reason for her discharge. Given our finding that Plaintiff did not meet her burden of showing that she is disabled within the meaning of the NJLAD, this becomes a moot point. See Clowes, 538 A.2d at 807. At this juncture, we simply observe that Defendants contend that Plaintiff was terminated for changing sales associates' time sheets to reflect that required meal breaks had been taken, among other performance-related issues. (Defs. Br. at 11.) Plaintiff conceded that changing sales associates' time

sheets "at the end of the week," rather than "on a daily basis,"
was a "bad decision" for which she "would have understood being
written up," although she obviously disagrees that termination
was an appropriate response.  (Defs. Stmt. Facts at ¶ 54; Pl.
Resp. Stmt. Facts at ¶ 54; Pl Dep. at 141:10-142:22.)  Thus, we
will proceed to the third step of the discrimination analysis.
See Jenkins v. Lakewood of Voorhees Assocs., No. 05-2603, 2007 WL
1931296, at *6 (D.N.J. July 2, 2007) (stating that defendant's
burden of articulating a legitimate, non-discriminatory reason
for termination is "relatively light" and that defendant need
only "show that there is a genuine issue of material fact as to
whether it discriminated against the plaintiff, not persuade the
court that it was actually motivated by the proffered reasons")
(quotations and citations omitted).

   **C.   Pretext**

   In considering the pretext step of the McDonnell Douglas
analysis, "the . . . issue is not whether the employer's reason
for terminating the plaintiff was wrong, but whether
discriminatory animus motivated the employer." Hood v. Pfizer,
Inc., No. 04-3836, 2007 WL 2892687, at *14 (D.N.J. Sept. 28,
2007).  We find that the record does not support an inference
that the reasons given for Plaintiff's termination were
pretextual or that her termination was motivated by
discriminatory intent.

The statements allegedly made by Medeiros to Plaintiff, "What's wrong with your brain?", "Does your brain even work?", and "Can you even read?", while rude and condescending, are discriminatory neither on their face nor in context. (Pl. Dep. at 116:12-14.)[6]  Beyond these statements, Plaintiff offers only her "perception" that Medeiros determined that Plaintiff could not do her job due to Plaintiff's ADD. (Pl. Dep. at 173:14-20; see also Pl. Dep. at 172:1-4 ("I believe that Elizabeth Medeiros discriminated against me all the way through to find a reason to terminate me and that falls into understanding I had ADD.").) This is insufficient to show pretext. Chambers v. Heidelberg USA, Inc., No. 04-583, 2006 WL 1281308, at *4 (D.N.J. May 5, 2006) ("Speculations, generalities, and gut feelings, however genuine, do not allow for an inference of discrimination to be drawn when they are not supported by specific facts.").

Plaintiff testified that when she called the Open Door Line to complain about Medeiros's treatment of her following her termination, she "gave very clear examples" of the alleged discrimination, but "never mentioned Attention Deficit

───────────────────────

[6] Plaintiff testified that the context of the "What is wrong with your brain" statement was a rebuke for an empty merchandising wall, in light of Plaintiff's previous retail experience. (Pl. Dep. at 119:9-14.)  Although Plaintiff stated at her deposition that Medeiros made similar comments about brain function over the phone on other occasions, she could not recall the specifics of such occasions. (Pl. Dep. at 121:5-9.)  "Can you even read?" was Medeiros's response to Plaintiff's apparent failure to conform to the directives of an email from Chico's management regarding the removal of holiday decorations. (Pl. Dep. at 124:12-125:15.)

22

Hyperactivity Disorder [because she] thought discrimination was discrimination, period, and someone needed to just act on that and investigate . . . further." (Pl. Dep. at 176:2-14.)  Thus, the record shows that Plaintiff never complained during the course of her employment that she thought she was being discriminated against because of her ADD, and other than Medeiros's vague brain function comments, no one at Chico's ever said anything to her relating to ADD. (Pl. Dep. at 179:3-6.)  Finally, Medeiros's comments do not appear discriminatory in light of the fact that Plaintiff sought a transfer out of Medeiros's sales district immediately following their first in-person encounter due to what she perceived as Medeiros's unfair and overzealous enforcement of Chico's store policies, months before Plaintiff alleges Medeiros became aware of her ADD. (Pl. Dep. at 45:25-50:4.)  The relationship between Plaintiff and Medeiros was, in Plaintiff's estimation, immediately antagonistic insofar as Plaintiff felt she went from "a model A store manager [for] the last district manager" to, "in a matter of a minute,  . . . someone who was just doing everything wrong." (Pl. Dep. at 50:15-18.)

We conclude that, even if Plaintiff had made out a prima facie case for unlawful discharge based on her alleged disability, which she has not, her claim would still fail because there is no evidence in the record that her termination was motivated by a discriminatory intent.

## CONCLUSION

For the reasons stated supra, the Court will grant summary judgment in favor of Defendants.  The Court will issue an appropriate Order and Judgment.


        s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge


Dated:    October 14, 2011

24